UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    No. 13-cr-192(1) (RHK/LIB)

v.                                           **REPORT AND RECOMMENDATION**

(1) Melanie Rose Benais,

                    Defendant.

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 40] (hereinafter "Motion to Suppress Evidence"), and Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 41] (hereinafter "Motion to Suppress Statements"). The case has been referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on September 4, 2013, regarding the Defendant's motions for discovery[1] and suppression. For reasons outlined below, the Court recommends that Defendant's Motion to Suppress Evidence, [Docket No. 40], be **DENIED**; and that Defendant's Motion to Suppress Statements, [Docket No. 41], be **GRANTED in part** and **DENIED in part**.

I.      **BACKGROUND**

Melanie Rose Benais ("Defendant Benais") was indicted on July 23, 2013, and made the present Motions, [Docket Nos. 40-41], on August 12, 2013. Defendant and her co-Defendant Ronalda Myra Smith ("co-Defendant Smith") are each charged with a single count of

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 54].

1

Kidnapping in violation of 18 U.S.C. § 1201(a)(2). (Indictment [Docket No. 1]).[2] The Court

held an evidentiary hearing on September 4, 2013, and at that time granted the parties' request

for additional time for briefing. (See Minute Entry [Docket No. 52]). Defendant Benais

submitted her Memorandum in Support of her suppression motions on September 26, 2013.

(Def.'s Mem. [Docket No. 68]); the Government submitted its Memorandum in Opposition on

October 7, 2013. (Mem. Opp. [Docket No. 69]). Defendant Benais is presently scheduled to

appear for trial before the Hon. Richard H. Kyle on December 3, 2013. (See Order [Docket No.

62]).

## II. FACTS[3]

### A. Traffic Stop and Arrest

Red Lake Police Sergeant Harlan Joseph Johnson ("Sgt. Johnson") was on patrol during

the early morning hours of June 13, 2013,[4] when he heard a call from dispatch advising Red

---

[2] The Indictment alleges that Defendant Benais, co-Defendant Smith, and the alleged victim are all Indians, and that the alleged crime took place within the exterior boundaries of the Red Lake Indian Reservation, thus making federal jurisdiction appropriate under 18 U.S.C. §§ 1151 and 1153(a). (See Indictment [Docket No. 1]).

[3] The facts in this Part are derived from the testimony of Red Lake Police Sergeant Harlan Joseph Johnson ("Sgt. Johnson"), Red Lake Criminal Investigator Paul Smith ("Investigator Smith"), and FBI Special Agent Ogden ("SA Ogden") at the September 4, 2013, motions and evidentiary hearing, and from the following Exhibits, which were offered, and the Court accepted into evidence, for purposes of the present Motions:

- **Government's Exhibit 1**: the Application for Search Warrant and Supporting Affidavit presented to the Court of Indian Offenses, Red Lake Indian Jurisdiction, United States Indian Services, on June 13, 2013;
- **Government's Exhibit 2**: an FBI Advice of Rights form, signed and executed by Defendant at the Red Lake Jail on June 13, 2013, at 11:03 a.m., and witnessed by SA Ogden and by Red Lake Criminal Investigator Geoff Pierre ("Investigator Pierre");
- **Government's Exhibit 3**: a compact disc containing an audio recording of SA Ogden's and Investigator Pierre's interview with Defendant at the Red Lake Jail on June 13, 2013, beginning at approximately 11:01 a.m., and running approximately 38 minutes;
- **Government's Exhibit 7**: the Search and Seizure Warrant, and accompanying application and affidavit, for search of Defendant's mobile phone (the "phone"), sworn out by SA Ogden on June 26, 2013, before the Hon. Mary Kay Klein, U.S. Magistrate Judge, and authorizing search of the phone between June 26, 2013, and July 10, 2013; and
- **Defendant's Exhibit 1**: The Red Lake Police dispatch log for the early morning hours of June 13, 2013.

[4] Sgt. Johnson testified only that these events took place during his June 12-13 shift. (Hr'g Tr. [Docket No. 65], at 13:24-25 – 14:1). However, the Red Lake Police dispatch log indicates that the first call was received shortly after midnight on June 13, 2013. (Def.'s Ex. 1).

Lake Police Corporal Branchaud[5] ("Cpl. Branchaud") to be on the lookout for a tan sports utility vehicle ("SUV") with a female tied up in the back. (Tr. at 14:1-3, 17-20).[6] Upon hearing the call, Sgt. Johnson at first proceeded toward the Camille White residence, which is where the call had originated, but later changed course when Cpl. Branchaud advised via radio that the suspect vehicle was traveling east from that residence on an old unpaved logging trail. (Id. at 14:25 – 15:1-2, 9-25).[7] Upon hearing Cpl. Branchaud's transmission, Sgt. Johnson moved to intercept the vehicle on a gravel road known as Old Barton's Camp Trail,[8] near the Walking Shield intersection. (Id. at 16:1-13). Cpl. Brachaud subsequently advised that the suspect vehicle was on Old Barton's Camp Trail south of his location, and Sgt. Johnson turned his vehicle around to meet the suspect vehicle. (Id. at 17:8-20).

Shortly thereafter, Sgt. Johnson met a tan SUV coming toward him on Old Barton's Camp Trail. (Id. at 18:6-8). He activated his emergency lights, stopped the SUV, and exited his vehicle to make contact with the SUV's driver. (Id. at 18:12-14). The SUV's driver was a woman Sgt. Johnson did not recognize, but a man he recognized as Dean Stately ("Mr. Stately") was in the passenger seat; Sgt. Johnson advised the driver that he was going to check the SUV because he had received a report of a girl tied up in the back of a vehicle. (Id. at 18:15-17, 22-25). Sgt. Johnson shined his flashlight through the window into the back of the SUV, where he observed a woman with her feet bound and her hands behind her back. (Id. at 19:3-9).[9] Upon seeing the woman bound in the back of the SUV, Sgt. Johnson returned to the front of the SUV

---

[5] Corporal Branchaud's first name was not provided.
[6] Citation to the Transcript ("Tr.") is to transcript of the digital recording of the September 4, 2014, motions hearing. [Docket No. 65].
[7] All locations described in this Report and Recommendation are within the exterior boundaries of the Red Lake Indian Reservation, unless otherwise noted.
[8] According to Sgt. Johnson's description, there are no houses on Old Barton's Camp Trail, which sees "quite a bit of traffic," but not as much as the Reservation's main highways. (Tr. at 54:6-12).
[9] Sgt. Johnson subsequently observed that the victim's hands were also bound, although when he first saw her he could only see that her feet were bound and that her hands were behind her back.

and ordered the driver and Mr. Stately to exit the SUV via the driver's-side door. (Id. at 20:4-6). Both the driver and the passenger complied by exiting the SUV and lying face-down on the ground; because he was still the only officer on the scene, Sgt. Johnson placed them both in handcuffs and detained them. (Id. at 20: 11-22; at 44:4-5, 13-14). Sgt. Johnson also did a pat-down search of both the driver and the passenger, and he removed a knife and a razor from the passenger, Mr. Stately's, pockets. (Id. at 26:22-24). It was at this time that Sgt. Johnson learned that the driver was Melanie Rose Benais, the Defendant in the present case. (Id. at 21:15-19).

About this time, Red Lake Police Officers Ken[10] and Hamre[11] arrived at the scene. The officers then helped Defendant Benais and Mr. Stately to their feet and advised them that they were being detained. (Id. at 22:16-18). Defendant Benais was escorted to the back seat of Sgt. Johnson's vehicle, and Mr. Stately was separately escorted to the back seat of Officer Hamre's vehicle. (Id. at 22:18-25). Sgt. Johnson at that time, while walking Defendant Benais to the back of his patrol vehicle, asked her why there was a woman tied up in the back of the SUV; Defendant answered, "she tried to stab me," and said that she was taking the woman home. (Id. at 23:3-8, 21-22).[12] After that, Sgt. Johnson placed Defendant Benais, who was still handcuffed, in the back of his patrol vehicle, told her that "she was being detained until I can get the whole thing figured out," and he locked her inside. (Id. at 23:11-12; at 24:2-16).

Sgt. Johnson then returned to the SUV, where he observed that S.N.[13] was bound both by her hands and her feet, and that her head had been shaved. (Id. at 25:5-12). The other two officers untied the belt that bound S.N.'s wrists, and Sgt. Johnson cut the belts that were binding

---

[10] Ken's last name was not provided.
[11] Officer Hamre's first name was not provided.
[12] Sgt. Johnson acknowledged at the September 4, 2013, motions hearing that in his incident report he had written that he asked Defendant this question while she was detained in the back seat of his patrol car, but he reasserted his testimony that he had asked the question while walking toward his patrol car, and stated that the error was in his written report. (Tr. at 45:11-25 – 46:1-9).
[13] In order to protect her privacy, the Court refers to the alleged victim by her initials.

her ankles and he helped her exit the SUV.[14]  (Id. at 25:21-25 – 26:1-2).  S.N.'s face was red and her eyes were closed, and she told Sgt. Johnson that she had been maced, and that Defendant Benais and someone named "Ronalda," who subsequently was determined to be co-Defendant Smith, had cut her hair and assaulted her.  (Id. at 26:2-4; at 47:11-16).  S.N. was taken to Cpl. Branchaud's vehicle, and he took her to the Red Lake Hospital.  (Id. at 26:13-14).

At that time, Sgt. Johnson returned to his vehicle, where Defendant Benais was still handcuffed and detained in the back seat, and he began to question her.  (Id. at 27:13-24).  Sgt. Johnson at this point had not yet advised Defendant Benais of her Miranda rights[15] (Id. at 48:1-3; at 49:8-11), but she did make statements at that time, including telling Sgt. Johnson that S.N.'s hair was at Defendant Benais' residence, and providing Sgt. Johnson with the location of her residence.  (Id. at 28:1-4, 14-18; at 31:11-22; at 120:4-5).[16]  Sgt. Johnson then arrested both Defendant Benais and Mr. Stately on suspicion of kidnapping, and advised Defendant Benais of her Miranda rights.  (Id. at 29:2-3, 7-8).

At about this time, Red Lake Criminal Investigator Paul Smith ("Investigator Smith")[17] arrived to process the scene.  (Id. at 29:21).  Investigator Smith collected the belts that were used to tie up S.N., and collected tufts of hair from the back of the SUV, while Sgt. Johnson photographed the evidence.  (Id. at 30:1-4; at 69:23-24).  Investigator Smith also noticed a strong chemical smell in the SUV, and he was told by Sgt. Johnson that S.N. reported she had been maced.  (Id. at 72:7-8).  Subsequently, Sgt. Johnson transported Defendant Benais to the Red

---

[14] Sgt. Johnson later learned through his investigation that the SUV belonged to S.N. and Wesley May or Wesley Jordan, and was registered to Wesley's brother.  (Tr. at 30:12-19).
[15] See Miranda v. Arizona, 384 U.S. 436 (1966).
[16] Sgt. Johnson also took a statement from Mr. Stately, (Tr. at 28:11-13), but that statement is not at issue in the present Motion.
[17] Investigator Smith testified at the September 4, 2013, motions hearing that he was unaware of any relationship between himself and co-Defendant Smith.  (Tr. 91:5-11).

Lake Jail without taking any further statements from her, and Investigator Smith had the tan SUV towed to a secure lot.  (Id. at 30:22-25 – 31:1; at 73:21-25 – 74:1-5).

### B.  Hospital Interview with S.N.

Investigator Smith then proceeded to the Red Lake Hospital, where he interviewed S.N. (Id. 74:7).  He described S.N. as looking "kind of beat up," with a swollen face and a wound resembling a bee sting on her forehead, and the sides of her head shaved.  (Id. at 13-17).  S.N. told Investigator Smith that she had been with Defendant Benais off and on throughout the day, and that she had been assaulted during the evening at Defendant Benais' residence,[18] where she said she had been maced and poked with a syringe or other sharp object.  (Id. at 74:20-24; at 75:10-12).  At this point, Investigator Smith decided to seek a search warrant for Defendant Benais' residence.  (Id. at 75:3-7).

### C.  Search Warrant for Defendant's Residence

After writing up his affidavit and application for a search warrant, Investigator Smith first went to the residence of Judge White[19] of the Red Lake Court of Indian Offenses ("Tribal Court"), but when he failed to make contact with Judge White, he then took his affidavit and application to the residence of Tribal Court Judge Defoe,[20] with whom he did make contact.  (Id. at 76:10-18).  Investigator Smith presented Judge Defoe with his affidavit and application,[21] and also related to Judge Defoe that S.N. had told him that the assault began at Defendant Benais'

---

[18] Investigator Smith did not recall whether S.N. had told him the location of Defendant's residence, and that he did not recall how he obtained Defendant's address, but that he may have obtained it from Sgt. Johnson, or from dispatch, or from the reservation housing agency.  (Tr. at 87:19-25 – 88:1-14; at 89:18-23).

[19] Judge White's first name was not provided.

[20] Judge Defoe's first name was not provided.  During the September 4, 2013, motions hearing, Investigator Smith acknowledged that he and Judge Defoe were first cousins, and that he also knew Judge Defoe from when Judge Defoe had worked at the Red Lake Police Department.  (Tr. at 82:20-25 – 83:1-5).

[21] Investigator Smith, who has spent more than seven years with the Red Lake Police Department, but had held the title of criminal investigator for only eight months, acknowledged during the September 4, 2013, motions hearing that his affidavit and application stated that he had been a criminal investigator for seven years.  (Tr. at 80:10-22).

residence.  (Id. at 77:13-17; at 81:15-17).[22]  Upon the record before him, Judge Defoe found probable cause and issued the search warrant, which specified as items to be searched for, among other things, scissors, shaving implements, needles, and mace or other chemical deterrents.  (Id. at 77:19-20; see also Gov't's Ex. 1).  Investigator Smith then returned to the police station to make copies, then proceeded to Defendant Benais' residence to meet Sgt. Johnson.  (Tr. at 77:21-25).

### D.  Search of Defendant's Residence

After leaving the scene of the traffic stop and arrest, Sgt. Johnson proceeded to Defendant Benais' residence, but upon encountering an aggressive dog, he decided to wait for Investigator Smith before approaching the residence.  (Id. at 31:23-25 – 32:5).  Sometime thereafter, a casino shuttle arrived and dropped off a man named Peter,[23] who identified himself as Defendant Benais' boyfriend; and Peter said that he also lived at the residence.  (Id. at 32:16-21).  Approximately two hours later, Investigator Smith arrived with a search warrant for Defendant Benais' residence.  (Id. at 32:22-25 – 33:1-3).  Upon being presented with the search warrant, Peter kept the dog on a leash and unlocked and opened the residence so that Sgt. Johnson and Investigator Smith could enter.  (Id. at 33:6-10).

Inside the kitchen of Defendant Benais' residence, Investigator Smith immediately noticed shaving equipment and a small can of mace on the kitchen counter.  (Id. at 78:23-25 – 79:1).  Investigator Smith collected evidence while Sgt. Johnson took photographs.  (Id. at 33:10-13).

---

[22] During the September 4, 2013, motions hearing, Investigator Smith did not recall whether he had verbally sworn under oath that his affidavit and application were true, but stated that by his signature he had attested to the truth of his affidavit and application.  (Tr. at 82:9-19).
[23] Sgt. Johnson did not recall Peter's last name during the September 4, 2013, motions hearing.  (Tr. at 32:16-17).

### E.  Interview at Red Lake Jail

FBI Special Agent Joe Allen Ogden ("SA Ogden") was first notified of the case by Investigator Smith during the early morning hours of June 13, 2013.  (Id. at 97:13-18).  Later that morning, at approximately 11:00 a.m., he and Red Lake Criminal Investigator Geoff Pierre ("Investigator Pierre") conducted an interview with Defendant Benais at the Red Lake Jail, where she was then in custody.  (Id. at 98:15-24; at 99:7-8).  The interview took place in the jail's interview room, which is a standard 10-foot-by-10-foot room with a desk and a couple of chairs.  (Id. at 99:2-3).  SA Ogden did not observe any signs that Defendant was intoxicated or otherwise under the influence of alcohol or drugs.  (Id. at 102:22-24).  SA Ogden recorded the interview, including where he read Defendant Benais the FBI's standard "Advice of Rights" form and she signed and executed that form waiving her right to counsel during questioning.  (Id. at 99:16-25 – 100:1-12; see also Gov't's Exs. 2-3).  Defendant Benais was cooperative and answered SA Ogden's and Investigator Pierre's questions, and there is no evidence that SA Ogden or Investigator Pierre made any promises to or threats against Defendant.  (Tr. at 102:25 – 103:1-3; Gov't's Ex. 3).

### F.  Search Warrant for Defendant's Mobile Phone

On June 26, 2013, SA Ogden made an application and swore out an affidavit before the Hon. Mary Kay Klein, U.S. Magistrate Judge ("Magistrate Judge Klein"), for a search and seizure warrant authorizing the search of the contents of Defendant Benais' black Samsung mobile phone (the "phone").  (Gov't's Ex. 7).  The phone was recovered from Defendant Benais' person on June 13, 2013, when she was first booked at the Red Lake Jail on suspicion of kidnapping.  (Id., Aff. at 1, ¶ 2).  SA Ogden stated in his application materials that the phone may have text messages, photographs, audio files, video files, geographic location data, or other

evidence related to the investigation.  (Id., Aff. at 2, ¶ 4).  In particular, SA Ogden stated that,

while S.N. was still tied up in the back of the SUV that Defendant Benais was driving, a witness

had asked her what was making noise in the back of the SUV, and that Defendant Benais had

texted S.N.'s name on the phone.  (Id., Aff. at 4, ¶ 9).  Based on that information, SA Ogden

stated his belief that there was probable cause that the phone contained evidence related to the

case.  (Id., Aff. at 5-6, ¶¶ 12-13).  Upon those representations, U.S. Magistrate Judge Klein

signed the warrant authorizing a search of the contents of the phone.  (Id., Warrant).

## III.    DEFENDANT BENAIS' MOTION TO SUPPRESS EVIDENCE [Docket No. 40]

In her written Motion, Defendant Benais asserts that (A) the initial traffic stop effected by

Sgt. Johnson in the early morning hours of June 13, 2013, was without probable cause and

lacking in any exigent circumstances; and that (B) the subsequently obtained search warrants for

Defendant Benais' residence and her mobile phone were not supported by probable cause.  (See

Docket No. 40).

### A.  The Traffic Stop and Search of the SUV

#### 1.  Standard of Review

The Fourth Amendment provides that "the right of people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. amend. IV.  "A traffic stop constitutes a 'seizure' within the meaning of the Fourth

Amendment."  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware

v. Prouse, 440 U.S. 648, 653 (1979)).  As such, the principles of Terry v. Ohio, 392 U.S. 1

(1968), govern traffic stops.  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

"Generally, a traffic 'stop must be supported by at least a reasonable, articulable suspicion that

criminal activity' has occurred or is occurring."  United States v. Fuse, 391 F.3d 924, 927 (8th

Cir. 2004) (quoting Jones, 269 F.3d at 924 (citing, in turn, Prouse, 440 U.S. at 663)); see also United States v. Cortez, 449 U.S. 411, 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

Courts have refused to create a "finely-tuned standard[]" or "a neat set of legal rules" as to what constitutes reasonable, articulable suspicion. Ornelas v. United States, 517 U.S. 690, 695-96 (1996). Therefore, the standard remains an "elusive concept." Cortez, 449 U.S. at 417. As such, reasonable suspicion justifying a traffic stop may be found when the "totality of the circumstances" demonstrates that the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Jones, 606 F.3d 964, 966 (8th Cir. 2010). "'This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"' United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting, in turn, Cortez, 449 U.S. at 418)).

## 2. Discussion

In the present case, the totality of circumstances demonstrates that Sgt. Johnson had reasonable suspicion of criminal activity sufficient to effect the initial traffic stop on the SUV being driven by Defendant Benais during the early morning hours of June 13, 2013.

Defendant Benais argues that the written dispatch logs for that morning contain no reference to a "tan SUV," or to any SUV, and, therefore, do not support Sgt. Johnson's testimony that he was advised to be on the lookout for a vehicle matching the description of the one that Defendant Benais was driving. (Def.'s Mem. [Docket No. 68], at 6-7 (citing Def.'s Ex. 1)).

However, Defendant is incorrect in her assertion that the absence of a specific vehicle description in the written dispatch logs "disproves Sergeant Johnson's testimony." (Id. at 7). The dispatch logs are not word-for-word transcripts of telephone and radio traffic, but instead, are more generalized accounts of events.[24] Sgt. Johnson testified that he heard over the radio to be on the lookout for a "tan SUV," and there is no evidence in the record to contradict that testimony.

In the alternative, even if Sgt. Johnson did not know the specific color or type of vehicle to be on the lookout for, the Court finds that he nonetheless had reasonable articulable suspicion to stop the vehicle that Defendant Benais was driving during the early morning hours of June 13, 2013. "In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"" United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (quoting Arvizu, 534 U.S. at 273 (quoting, in turn, Cortez, 449 U.S. at 418)); Untied States v. Gaulden, No. 10-cr-120 (PJS/JJK), 2010 U.S. Dist. LEXIS 62468, at *11 (D. Minn. June 14, 2010) (Keyes, M.J.) (quoting Ortiz-Monroy), adopted by 2010 U.S. Dist. LEXIS 62463 (D. Minn. June 22, 2010) (Schiltz, J.). Additionally, the Court may consider "the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop." United States v. Juvenile TK, 134 F.3d 889, 903 (8th Cir. 1998).

The present case is analogous to Orricer v. Erickson, 471 F.2d 1204 (8th Cir. 1973), and

---

[24] Additionally, the dispatch log shows that the operator asked the first caller to report the kidnapping both what kind of vehicle they were in, and what color the vehicle was. (Def.'s Ex. 1). Although the answers to these questions were not recorded, the mere fact that they were asked suggests that the operator and any officers she was in radio communication with may have been provided answers to those questions. The only evidence in the record shows that this information must have been provided to dispatch because the testimony was that it was relayed by radio and heard by Sgt. Johnson.

Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1969). In Orricer, the petitioner brought a collateral attack against his South Dakota state court conviction for burglary, arguing *inter alia* that his arrest and conviction arose from an unlawful traffic stop for which there was no justification. 471 F.2d at 1205-06. The Orricer court observed that, given that the petitioner was stopped within one hour of the reported burglary, and that plaintiff's vehicle was one of just two vehicles observed in the small town's downtown area, "the police acted reasonably in stopping individuals and autos within the vicinity of the crime for the purpose of requesting identification." Id. at 1207. The Orricer court looked to and drew upon the Carpenter opinion. Orricer, 417 F.2d at 1207. In Carpenter, the petitioner similarly challenged his conviction on charges of burglar and possession of burglary tools, arguing that evidence against him at trial should have been suppressed as the result of an allegedly improper traffic stop resulting in a search and seizure. 419 F.2d at 170. The traffic stop in Carpenter occurred in a small Nebraska town that "had been plagued by a series of burglaries," and officers saw the petitioner in his vehicle, which bore out-of-county plates, driving slowly through the town, apparently slowing down even further as it passed various businesses. Id. Although "[n]o traffic violation was observed," the officers activated their emergency light and stopped the petitioner's vehicle. Id. Applying Terry v. Ohio to those facts, the Eighth Circuit held "that the police officers were reasonable in the initial seizure of [the petitioner]." Carpenter, 419 F.2d at 172 (internal quotations omitted).

The present case presents similar circumstances. Sgt. Johnson was aware of an active kidnapping in progress investigation. Additionally, having been very recently advised that the suspect vehicle had departed the Camille White residence via a little-used unpaved trail, Sgt. Johnson had positioned himself at a likely intercept point on Old Barton's Camp Trail at

Walking Shield. Upon being further advised that the suspect vehicle was south of his location on Old Barton's Camp Trail, Sgt. Johnson again moved to intercept. There are no residences on Old Barton's Camp Trial, and although the road does carry "quite a bit of traffic," it is reasonable to assume that there would be little traffic at that very early hour.

Defendant Benais argues that her "mere presence on a back road does not alone create a reasonable, particularized suspicion of criminal activity." (Def.'s Mem. [Docket No. 68], at 7). However, the additional circumstances Sgt. Johnson had available to consider included:

- That the time (shortly after midnight) and location (an unpaved back road with no houses) meant that traffic, at that time, likely would be light;

- That Cpl. Branchaud had very recently reported that the suspect vehicle had left the Camille White residence by way of an old unpaved trial, and had subsequently (and even more recently) reported that the suspect vehicle was on Old Barton's Camp Trail south of Sgt. Johnson's location; and

- That, based on his experience, his knowledge of the area, and Cpl. Branchaud's reports, Sgt. Johnson had placed himself in a position to intercept the oncoming suspect vehicle.

The fact that Sgt. Johnson was investigating an active kidnapping in progress, by itself, strengthens the case for his Terry stop of the SUV. Although a warrant generally is required for a search of private property, "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation and citation omitted). In light of the active kidnapping investigation, Sgt. Johnson was justified

in taking the minimally invasive steps of stopping the SUV that Defendant Benais was driving and shining his flashlight through the back window to look inside.  Cf. United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1995) (police who located kidnap and sexual assault victim were justified in removing lock from armored gate and making warrantless entry into apartment).[25]

Considering the totality of the circumstances, the Court finds that, upon encountering the SUV driven by Defendant Benais on Old Barton's Camp Trail in the early morning hours of June 13, 2013, Sgt. Johnson had a "reasonable, articulable suspicion that criminal activity [had] occurred or [was] occurring," Fuse, 391 F.3d at 927, when he effected the traffic stop.  Critically, even though the Court previously found that evidence in the record supported Sgt. Johnson's testimony that the SUV being driven by Defendant Benais matched the description of a vehicle that Sgt. Johnson had been told via radio to look out for, the Court here finds that even if Sgt. Johnson had not had such a description of the vehicle, he still would have had reasonable suspicion to effect the traffic stop based on the facts articulated in the immediately preceding paragraph.  Accord Orricer, supra.

Therefore, in light of the validity of Sgt. Johnson's traffic stop of the vehicle that Defendant Benais was driving during the early morning hours of June 13, 2013, the Court recommends that Defendant's Motion to Suppress Evidence obtained in searches incident to that stop [Docket No. 40] be **DENIED**.

---

[25] Other exceptions to general rule that a search requires a warrant would also apply in the present case, including the automobile exception, United States v. Brooks, 715 F.3d 1069, 1075 (8th Cir. 2013) ("'[u]nder the so-called automobile exception to the warrant requirement, police officers may conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists'" (quoting United States v. Sample, 136 F.3d 562, 564 (8th Cir. 1998) (citing, in turn, California v. Acevedo, 500 U.S. 565, 580 (1991)))), and the plain view doctrine, United States v. Darr, 661 F.3d 375, 379 (8th Cir. 2011) ("'It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object'" (quoting United States v. Bustos-Torres, 396 F.3d 935, 944 (8th Cir. 2005))).

**B. Searches of Defendant Benais' Residence and Mobile Phone Pursuant to Search Warrants**

**1. Standard of Review**

As previously noted in Part III.A.1, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 U.S. Dist. LEXIS 116899, at *6 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting Solomon, 432 F.3d at 827) (alterations in original). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the

issuing judicial officer.'" <u>United States v. Smith</u>, 581 F.3d 692, 694 (8th Cir. 2009) (quoting

<u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)).  Nevertheless, "[a] magistrate's

'determination of probable cause should be paid great deference by reviewing courts.'" <u>Gates</u>,

462 U.S. at 236 (quoting <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)).  "[T]he duty of a

reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

[concluding]' that probable cause existed." <u>Gates</u>, 462 U.S. at 238-39 (quoting <u>Jones v. United

States</u>, 362 U.S. 257, 271 (1960)).

### 2. Discussion

Upon review of the applications and affidavits supporting the search warrants, the Court

finds that both are supported by probable cause.

### a. Search of Defendant's Residence

Defendant Benais first argues that the search warrant issued for her residence was invalid

because (1) it was not issued by a "neutral and detached magistrate"; (2) the supporting

Affidavit's description of the location of Defendant's residence[26] was obtained by means of an

illegal interrogation, and that fact was misrepresented in the Affidavit; and (3) the Affidavit

failed to state with particularity the reasons that certain evidence should be seized.  (Def.'s Mem.

[Docket No. 68], at 11-15).  The Court is not persuaded by these arguments.

### i. "Neutral and detached magistrate"

Defendant Benais argues that because Tribal Court Judge Defoe and Investigator Smith

are cousins, and because they knew each other from Judge Defoe's previous work with the Red

Lake Police Department, therefore Judge Defoe was not a "neutral and detached magistrate."

Therefore, Defendant concludes that and any evidence obtained during the search pursuant to the

---

[26] The Affidavit does not list an address, but instead describes the location of Defendant's residence as "1st house on the right Circle Pines Main rd."  (Gov't's Ex. 1, Aff. at 1).

warrant issued by Judge Defoe in this case should be suppressed.  (Def.'s Mem. [Docket No. 68], at 11-12).

"The Constitution generally requires that 'someone independent of the police and prosecution' review a warrant application."  United States v. Lucas, 499 F.3d 769, 775 (8th Cir. 2007) (en banc) (quoting Shadwick v. City of Tampa, 407 U.S. 345, 348).[27]  "In determining whether a warrant is supported by probable cause, "the courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police."  United States v. Frazier, 423 F.3d 526, 537 (6th Cir. 2005) (citing United States v. Leon, 468 U.S. 897, 914 (1984)).  "The defendant carries the burden of proving that the issuing magistrate acted as a rubber stamp."  Id. (citing United States v. Rodriguez-Suazo, 346 F.3d 637, 649 (6th Cir. 2003)).

In support of her argument, Defendant Benais cites to 28 U.S.C. §§ 455, which provides circumstances upon which federal judges must disqualify themselves from a proceeding.[28] However, 28 U.S.C. § 455 applies specifically to *federal* judges.  Defendant provides no authority, and the Court has identified none, that would suggest either that judges of the Red Lake Court of Indian Offenses are bound by 28 U.S.C. § 455, or that the federal courts have

---

[27] The particular issue in Lucas was the issuance of an arrest warrant, not a search warrant.  449 F.3d at 775.  However, the Lucas court noted that the U.S. Supreme Court has applied similar standards for evaluating neutrality with regard to arrest warrants and search warrants.  Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 449-50 (1971)).

[28] Defendant cites particularly to 28 U.S.C. § 455(a), which provides: "Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Additionally, Defendants cites to 28 U.S.C. § 455(b)(5), which provides:
  (b) He shall also disqualify himself in the following circumstances:
    (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
      (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
      (ii) Is acting as a lawyer in the proceeding;
      (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
      (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

extended 28 U.S.C § 455 jurisprudence to decisions made by tribal court judges. Thus, Defendant's specific reliance on this statute is unavailing.

Defendant Benais also cites generally to <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971), in which the U.S. Supreme Court invalidated a warrant that was not issued by a "neutral and detached magistrate." 403 U.S. at 449. However, <u>Coolidge</u> is easily distinguished from the present case. In <u>Coolidge</u>, the warrant was issued by the state's Attorney General, "who was actively in charge of the investigation and later was to be chief prosecutor at the trial." <u>Id.</u> at 450. In striking down the warrant, the Court there noted that "the whole point of the basic rule . . . is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations." <u>Id.</u> In the present case, Judge Defoe was not directly involved in the case, apart from his issuance of the search warrant, and therefore, the issue of impartiality that presented itself in <u>Coolidge</u> is simply not evident here.

Ultimately, in sum, Defendant Benais simply argues that because of the distant familial and past workplace relationships between Judge Defoe and Investigator Smith, the search and seizure warrant issued by Judge Defoe was invalid and evidence seized pursuant to that warrant should be suppressed. However, Defendant has provided no evidence that Judge Defoe was not "independent of the police and prosecution" in the sense intended by the <u>Coolidge</u>, <u>Shadwick</u>, and <u>Lucas</u> courts.[29] Judge Defoe's relationship as a cousin of Investigator Smith and their past working relationship *might* might provide the context for an argument of impartiality were there other evidence that Judge Defoe merely "acted as a rubber stamp." However, there is no such evidence in the present case.

---

[29] Defendant also ignores the fact that Investigator Smith first took his affidavit and application to Judge White, and went to Judge Defoe only after failing to find Judge White at home. The present record does not evidence any overt effort by law enforcement to find a more favorable judicial officer to act on the warrant application.

Consequently, with regard to her argument that evidence seized pursuant to Judge Defoe's search warrant should be suppressed because Judge Defoe was not a "neutral and detached magistrate," the Court recommends that Defendant Benais' Motion to Suppress Evidence, [Docket No. 40], should be **DENIED**.

### ii. The location of Defendant's residence

Defendant Benais next offers two reasons that the Court should find the search warrant for her residence to be invalid based on the warrant's description of the location of the residence. First, she argues that Investigator Smith "knowingly or recklessly" misrepresented the source of that information in his affidavit, attributing it to S.N. (Def.'s Mem. [Docket No. 68], at 12-13). Second, she asserts that the real source of this information was Sgt. Johnson's custodial interview with Defendant Benais and, therefore, that the location of Defendant's residence was "fruit of the poisonous tree." (Id. at 14). Neither argument is persuasive.

First, the plain language of Investigator Smith's Affidavit does not support Defendant Benais' argument that he provided false information. The Affidavit reads, in relevant part:

> Upon receiving information from [S.N.], it was discovered that she had been assaulted and held against her will for an extended period of time at the Melanie Benais residence in Circle Pines (1st house on the right Circle Pines Main rd).

(Gov't's Ex. 1, Aff. at 1, ¶ 3). Defendant argues that this contains a false statement because it *implies* that S.N. was the source of the specific location of Defendant's residence. However, although Investigator Smith clearly identifies S.N. as the source of the fact that she was "assaulted and held against her will . . . at the Melanie Benais residence in Circle Pines," the parenthetical plainly differentiates the location information for which no source is attributed.

Next, even if the specific location of Defendant Benais' residence was obtained from

Defendant by Sgt. Johnson during a custodial interview,[30] that is insufficient reason to invalidate the warrant. The U.S. Supreme Court has recognized that an officer's questions concerning a suspect's "name, address, height, weight, eye color, date of birth, and current age . . . fall within a 'routine booking question' exception [and] . . . fall outside the protections of Miranda and the answers thereto need not be suppressed." Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990). Although Sgt. Johnson was not actually booking Defendant Benais at the time that he asked for her address, the District of Minnesota and other courts have rejected the argument that the routine booking question exception applies only to the booking process, embracing instead a broader view that such routine questions generally fall outside of Miranda's purview. United States v. Metcalf, No. 05-cr-275 (DSD/JJG), 2005 U.S. Dist. LEXIS 34714, at *4-5 (D. Minn. Nov. 29, 2005) (Doty, J.); see also United States v. Fisher, 181 Fed. Appx. 426, 427 (2d Cir. 2006) (per curiam). Therefore, even if Investigator Smith obtained Defendant's address from Sgt. Johnson, who had first obtained it from Defendant Benais during a custodial interview, the address nonetheless is not "fruit of the poisonous tree," and does not consequently invalidate the warrant.

Finally, even if Defendant Benais' statement to Sgt. Johnson regarding her address did not fall within the routine booking questions exception to Miranda, the Court finds that the investigators ultimately would have learned her address as a result of inevitable discovery. For the doctrine of inevitable discovery to apply, "there must be an ongoing line of investigation that is distinct from the impermissible or unlawful technique, . . . [and] there must be a showing of reasonable probability that the permissible line of investigation would have led to the independent discovery of the evidence." United States v. Villalba-Alvarado, 345 F.3d 1007,

_____

[30] The Court does conclude, in Part IV.A.2.b, infra, that Sgt. Johnson's questioning of Defendant was custodial and, because he did not provide her with a Miranda warning, that any incriminating statements in response to questioning should be suppressed.

1019 (8th Cir. 2003) (citing <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984)).  In the present case, Investigator Smith already had been told that the alleged crime took place at Defendant Benais' residence, and he could have obtained her address through sources of information other than Sgt. Johnson, such as the Tribal housing agency.

Because the Search Warrant application does not contain false information with regard to the source of information as to Defendant Benais' address, and because even if Defendant's address was obtained during a custodial interview, it would be subject to the routine booking questions exception and, therefore, admissible.  Further, even if the address information obtained by Sgt. Johnson was not admissible as a routine booking question, Defendant's address could have been obtained by Investigator Smith through inevitable discovery.  Accordingly, with respect to Defendant Benais' argument that the search and seizure warrant issued for her residence must be suppressed because of improprieties related to information in the search warrant application as to her address, the Court recommends that her Motion to Suppress Evidence, [Docket No. 40], should be **DENIED**.

### iii.  Particularity

Finally, Defendant Benais argues that Investigator Smith's Affidavit in support of the search warrant application was insufficient to show probable cause because, "[a]lthough he listed mace, scissors, and needles as items to be searched [for], he failed to explain in his affidavit how those items related to the alleged assault on S.N. or why they would be found at [Defendant's] residence."  (Def.'s Mem. [Docket No. 68], at 15).  This argument, too, fails to persuade the Court.

"A search warrant must contain a description of the place to be searched in order to comply with the fourth amendment's particularity requirement."  <u>United States v. Curry</u>, 911

F.2d 72, 76 (8th Cir. 1990) (citing United States v. Alberts, 721 F.2d 636, 639 (8th Cir. 1983)).

In the present case, the search warrant does so, providing the neighborhood and specific location of Defendant Benais' residence.  (Gov't's Ex. 1).  Additionally, "[t]he language of a search warrant must describe the items to be seized with sufficient particularity: 'the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized.'"  United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995) (quoting United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992)).  Again, in the present case, the search warrant meets this requirement by specifying that those executing the warrant should search Defendant Benais' residence for "chemical deterrent (Mace), scissors, hair shaving equipment, needles, and peroxide."  (Gov't's Ex. 1).

Defendant does not argue that the search warrant fails to meet either of these two requirements.  Instead, Defendant Benais argues that the affidavit and application for the search warrant must provide some sort of nexus between the two—in other words, she argues that the affidavit must state not only *what* to search for, but *why*.  (See Def.'s Mem. [Docket No. 68], at 14-15).  Defendant cites no case law, and the Court has found none, in support of this argument, which runs contrary to the plain language of the Fourth Amendment that states in relevant part that: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*"  U.S. Const. amend. IV (emphasis added).  The affidavit in support of the search warrant for Defendant Benais' residence adequately explains the basis for law enforcement seeking authority to search Defendant Benais' residence, and the resulting warrant itself in the present case meets all of the particularity requirements: (1) it particularly describes the place to be searched by

specifying the location of Defendant Benais' residence; and (2) it particularly describes the things to be seized.

Consequently, with regard to her argument that the search and seizure warrant issued for her residence lacked sufficient particularity with regard to the *reasons* certain evidence should be seized, the Court recommends that Defendant Benais's Motion to Suppress Evidence, [Docket No. 40], should be **DENIED**.

### b. Search of Defendant's Mobile Phone

With regard to the Federal warrant authorizing a search of the contents of Defendant Benais' mobile phone, Defendant merely "requests the Court review the [four corners of the] warrant for probable cause." (Def.'s Mem. [Docket No. 68], at 16).

Because Defendant has not identified any specific reason that she believes this search warrant should be suppressed, and has offered no factual or legal grounds for suppression, the Court could recommend denying Defendant's Motion to Suppress Evidence, [Docket No. 40], with regard to the warrant for her mobile phone, solely on the basis that she has failed to meet her burden of production. United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 U.S. Dist. LEXIS 112286, at *10 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); and United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999) (Mason, M.J.), adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) (Kyle, J.)), adopted by 2009 U.S. Dist. LEXIS 112176 (D. Minn. Dec. 2, 2009) (Frank, J.). "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits of the [Defendants'] Motion[s] . . . ." Id. (citing United States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).

### 1. Standard of Review

The standard of review for the Federal warrant authorizing search of Defendant Benais' mobile phone is the same as the standard of review for the Tribal warrant authorizing the search of her residence. <u>See</u> Part III.B.1.

### 2. Discussion

Based on the information provided in SA Ogden's Affidavit in support of the warrant application, there is sufficient evidence to conclude that probable cause existed for the issuance of the Federal warrant for a search of Defendant Benais' mobile phone. In his Affidavit, SA Ogden states that a mobile phone may contain geographic location in formation that would assist investigators in determining Defendant Benais' whereabouts on the day of the alleged crime. Additionally, and more specifically, SA Ogden states that a witness had observed Defendant Benais entering and displaying possible information concerning the alleged kidnapping on the mobile phone that is the subject of the warrant. Considering the totality of the circumstances and the deference this Court must afford Magistrate Judge Klein's decision in issuing the search warrant, the Court concludes that there was a fair probability that contraband or evidence of a crime would be found as a result of the search of Defendant's mobile phone. <u>See gen.</u>, <u>United States v. Velazquez-Ramos</u>, No. 11-cr-111 (MJD/FLN), 2011 U.S. Dist. LEXIS 67651, at *14 (D. Minn. Apr. 29, 2011) (Noel, M.J.) (quoting <u>Gates</u>, 462 U.S. at 238), <u>adopted by</u> 2011 U.S. Dist. LEXIS 67588 (D. Minn. June 23, 2011) (Davis, C.J.).

Accordingly, with regard to the Federal warrant authorizing the search of Defendant Benais' mobile phone, the Court recommends that her Motion to Suppress Evidence, [Docket No. 40], should be **DENIED**.

**IV.    DEFENDANT BENAIS' MOTION TO SUPPRESS STATEMENTS [Docket No. 41]**

In her Memorandum, Defendant Benais challenges both (1) the statements that she made to Sgt. Johnson at the scene of the initial traffic stop, and (2) the statements she made to SA Ogden and Investigator Pierre at the Red Lake Jail.  (Def.'s Mem. [Docket No. 68], at 7-10).

**A.  Statements Made at the Scene of the Traffic Stop and Arrest**

Defendant Benais spoke with Sgt. Johnson twice at the scene of the initial traffic stop and her arrest: first, while Defendant was handcuffed, when Sgt. Johnson asked why there was a woman tied up in the back of the SUV that Defendant was driving; and second, when she was questioned while handcuffed and detained in the back seat of Sgt. Johnson's patrol vehicle.

**1.  Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of [her] [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question."  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody."  Id. (internal quotation omitted).

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)).  "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning.  Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).  Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'"  Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  Griffin, 922 F.2d at 1347, 1349.  The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest.  Stansbury, 511 U.S. at 322.  "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"  United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v.

United States, 543 U.S. 1145 (2005)).  The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody."  Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### 2. Discussion

Defendant Benais argues that all statements that she made to Sgt. Johnson should be suppressed because she was not provided a Miranda warning before making any statement. (Def.'s Mem. [Docket No. 68], at 7-10).  The Court finds that Defendant Benais was in custody when she made her first statement.  With regard to the second statement, the Government concedes that Defendant Benais was in custody at the time.  Therefore, the challenged statements should be suppressed and excluded as evidence as part of the Government's case-in-chief.

### a. Defendant Benais' first statement to Sgt. Johnson

Defendant Benais made her first statement to Sgt. Johnson, who had handcuffed her and was escorting her to his patrol vehicle to be detained, in response to his question asking why there was a woman tied up in the back of the SUV that she was driving.  Upon a review of the Griffin factors and the totality of the circumstances, the Court finds that Defendant Benais was "in custody" when she made her first statement to Sgt. Johnson at the scene of the traffic stop and her arrest during the early morning hours of June 13, 2013.  Additionally, the Court is not persuaded by the Government's argument that Sgt. Johnson's question was merely "general on-the-scene questioning" that falls outside the purview of Miranda.

The first Griffin factor does not mitigate against a finding of custody.  There is no evidence in the record that Defendant Benais was told that her participation in questioning was voluntary.  Defendant was handcuffed at the time, and being escorted to Sgt. Johnson's patrol

car.  There is also no evidence that Sgt. Johnson ever told Defendant Benais that she was free to

leave, and in fact, to the contrary, Sgt. Johnson told Defendant specifically that "she was being

detained until I can get the whole thing figured out."  The Court finds that the totality of the

circumstances indicates that Sgt. Johnson did not in any way advise Defendant Benais, or by his

actions even imply, that she did not have to answer his question.  Therefore, the first Griffin

factor does not mitigate against a finding of custody.

Nor does the second Griffin factor mitigate against a finding of custody.  In the present

case, at the time Sgt. Johnson asked Defendant Benais his question, Defendant was handcuffed

and being escorted to the back seat of a patrol vehicle specifically to be "detained."  See United

States v. Sims, No. 13-cr-109 (DSD/JSM), 2013 U.S. Dist. LEXIS 116965, at *15 (D. Minn. July

29, 2013) (Mayeron, M.J.) (finding custody in part because defendant "was in handcuffs, and for

at least part of the interrogation, located in the back of a police vehicle which he could not leave

on his own"), adopted by 2013 U.S. Dist. LEXIS 115470 (D. Minn. Aug. 15, 2013) (Doty, J.).

In other words, Defendant's "freedom of action" at the time she made her first statement to Sgt.

Johnson was precisely "curtailed to a degree associated with formal arrest."  Stansbury, 511 U.S.

at 322; Griffin, 922 F.3d at 1349.  Therefore, the second factor does not mitigate against a

finding of custody.

The third Griffin factor does somewhat mitigate against a finding of custody.  Although

Defendant did not initiate questioning,[31] she did answer Sgt. Johnson's question when she could

have simply remained silent.  However, given the three aggravating factors which weigh in the

---

[31] The Eighth Circuit has made it clear that the question of who initiated the interview is not dispositive for this
factor, much less for the broader question of whether the interview was custodial:

> In considering the third mitigating factor, the district court correctly found that Axsom did not initiate or
> arrange for the questioning.  *However, the court failed to analyze the disjunctive prong of the third
> mitigating factor – whether the defendant voluntarily acquiesced to requests by federal agents to answer
> questions.*

Axsom, 289 F.3d at 501 (emphasis added).

other direction, the Court finds this slight mitigation is not enough to render the first statement non-custodial. Cf. Griffin, 922 F.2d at 1349 (strong showing on one factor may make up for deficiency in other factors).

Two of the three aggravating Griffin factors weigh heavily in favor of a finding of custody.

Only the fourth factor fails to aggravate in favor of custody because there is no evidence that Sgt. Johnson used strong-arm tactics or deceptive stratagems. He did not brandish his weapon, nor did he yell at or otherwise threaten Defendant. See Axsom, 289 F.3d at 502 (finding no strong-arm tactics where officers "did not adopt a threatening posture toward [defendant], display their weapons, or make a physical show of force during the questioning"); United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993) (finding no strong-arm tactics where investigators "did not yell at [defendant], [or] threaten him"). Nor did he use any deceptive stratagems, such as the good-cop, bad-cop routine. See Id. (citing "good-cop, bad-cop routine" as example of deceptive stratagem); United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing Miranda, 384 U.S. at 452, 455)). Sgt. Johnson "asked [a] straightforward question[] and [Defendant] gave [a] straightforward answer[]." Axsom, 289 F.3d at 502 (internal quotations omitted). Finally, Sgt. Johnson did not make any promises to Defendant.

However, both the fifth and sixth Griffin factors weigh strongly in favor of custody. The fifth factor supports a finding of custody, because the circumstances surrounding the first statement were police dominated. Although the questioning leading to the first statement was brief, consisting of only a single question and answer, the circumstances clearly were police dominated: Sgt. Johnson had ordered Defendant Benais out of the vehicle she was driving; he

had instructed her to lie face-down on the gravel road; and he cuffed her hands behind her back. At the time of the questioning, at least two additional officers had arrived on the scene, and Sgt. Johnson was escorting Defendant to his patrol vehicle specifically to be "detained." See Sims, 2013 U.S. Dist. LEXIS 116965, at *15-16 (finding that at least five officers on scene where defendant was handcuffed created a police-dominated atmosphere). Thus, the fifth factor weighs strongly in favor of a finding of custody. Finally, the sixth factor is the easiest to resolve: Defendant Benais was arrested following questioning. Although she was not arrested immediately after the first brief interview, she was "detained" even before the conclusion of this brief interview, and she was not free to leave at any time thereafter and up to the time of her formal arrest.

Upon the totality the circumstances, the Court finds that Defendant Benais was in custody when she answered Sgt. Johnson's question about why there was a woman in the back of the SUV she was driving. Because Defendant Benais was in custody, Sgt. Johnson was required to provide her with a Miranda warning; consequently, the fact that Defendant was not given a Miranda warning before questioning is sufficient reason to suppress her statement.

The Government argues that the matter of custody and therefore the Griffin factors are not relevant to the first statement because Sgt. Johnson's question was merely a "general on-the-scene questioning as to facts surrounding a crime" which the Supreme Court in Miranda expressly exempted from their holding. Miranda 384 U.S. at 477-78 (directing holding toward "the compelling atmosphere inherent in the process of in-custody interrogation"). However, the case authority regarding the issue of "general on-the-scene questioning as to the facts surrounding a crime" being exempt from Miranda requirements presents different sorts of questions being asked than the question that Sgt. Johnson asked Defendant Benais. In United

States v. Howard, 532 F.3d 755 (8th Cir. 2008), the Eighth Circuit held that the relevant inquiry in this analysis was whether the officer's statement or question to a defendant was one "that the police should know [is] reasonably likely to elicit an incriminating response." Id. at 762. In Howard, the court affirmed the district court's holding that the officers' mere statement to a defendant that the officers were in the area because of complaints about gunshots and gang activity was not likely to elicit an incriminating response from the defendant. Id. In the present case, if Sgt. Johnson had merely asked the identity of the woman in the back of the SUV, such a question might qualify as a "general on-the-scene question." But he did not—he asked the Defendant *why* was there a woman tied up in the back of the SUV; that question is almost certain to generate an incriminating answer. See also Untied States v. Thomas, No. 12-cr-128 (JJK/MJD), 2012 U.S. Dist. LEXIS 184169 (D. Minn. Dec. 19, 2012) (Keyes, M.J.) ("An officer asking 'What happened,' 'What is going on,' and 'What was the rope for' to a handcuffed inmate he is taking to a segregated housing unit within the prison as part of the institution's disciplinary procedures in response to a prison fight is fundamentally different from a police officer who responds to a call and then asks unrestrained citizens what they know about a suspected crime."), adopted by 2013 U.S. Dist. LEXIS 3511 (D. Minn. Jan. 7, 2013) (Davis, C.J.).

Because the Court finds that Defendant Benais was in custody and had not been given a Miranda warning at the time she made her first statement in response to the question by Sgt. Johnson, and that the "general on-the-scene questions" exception does not now apply, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 41], be **GRANTED in part** such that Defendant Benais' first statement to Sgt. Johnson during the early morning hours of June 13, 2013, be suppressed and excluded from evidence in the Government's case-in-chief.

### b.  Defendant Benais' second statement to Sgt. Johnson

Defendant Benais' second statement consists of her responses to Sgt. Johnson's questioning while she was handcuffed and detained in the back of his patrol vehicle and he sat in the front of the vehicle.  The Government concedes that Defendant was in custody when she made the second set of potentially incriminating statements in response to Sgt. Johnson's questioning prior to giving her a <u>Miranda</u> warning.  The Government consequently represents to the Court that it "agrees not to use this statement in its case in chief."  (Mem. Opp. [Docket No. 69], at 21).

Therefore, the Court recommends that Defendant Benais' Motion to Suppress Statements, [Docket No. 41], be **GRANTED in part** such that her second statement to Sgt. Johnson during the early morning hours of June 13, 2013, be suppressed and excluded from evidence in the Government's case-in-chief.[32]

### c.  Availability of Defendant Benais' first and second statements for impeachment or rebuttal

An issue remains as to whether the Government may use the suppressed incriminating statements made to Sgt. Johnson for impeachment purposes at trial.  This Court recommends that the question be answered in the affirmative.

With regard to all of the statements by Defendant Benais that are subject to suppression, the Government notes that Defendant "has not challenged the voluntariness of the statement," and "respectfully requests that the Court find that the statement was voluntary and may be used for impeachment purposes should Defendant Benais testify at trial."  (Mem. Opp. [Docket No.

---

[32] The Court previously found that question by Sgt. Johnson concerning Defendant Benais' address was a "routine booking question" which fell outside the purview of <u>Miranda</u>.  <u>See</u> Part III.B.2.a.ii, <u>supra</u>.  Accordingly, even if incriminating portions of Defendant Benais' second statement are suppressed, the Government nevertheless is allowed to use her answers to questions regarding her address.

69], at 21). "Under established Supreme Court precedent," it is "permissible" for the Government to use "illegally obtained statements" for "impeachment and rebuttal purposes" after the person who made those illegally obtained statements first testifies at trial. Krimmel v. Hopkins, 44 F.3d 704, 709 (8th Cir. 1995) (citing Harris v. New York, 401 U.S. 222, 225 (no Fifth Amendment violation to use illegally obtained statements for impeachment purposes); Michigan v. Harvey, 494 U.S. 344, 350-53 (1990) (same under Sixth Amendment).

Accordingly, although the Court recommends suppressing the incriminating portions of Defendant Benais' first and second statements made in response to interrogation conducted by Sgt. Johnson without a Miranda warning on June 13, 2013, the Court also recommends that these statements be available to the Government for impeachment and rebuttal purposes.

### 2. Statements at the Red Lake Jail

There is no question that Defendant Benais was "in custody" for purposes of Miranda when she was interviewed by SA Ogden and Investigator Pierre at the Red Lake Jail on June 13, 2013 (the "jail interview"). The record before the court indicates that Defendant Benais was read a Miranda warning before those interviews, and that she executed signed waivers before the interviews. Thus, the question for the Court is whether Defendant knowingly and voluntarily waived her Miranda rights.

### a. Standard of Review

A defendant's waiver of her Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must inquire whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to
abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting

Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"The government has the burden of proving the validity of the Miranda waiver by a

preponderance of the evidence."  United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

The court "must examine both 'the conduct of the law enforcement officials and the capacity of

the suspect to resist pressure to confess.'"  United States v. Syslo, 303 F.3d 860, 866 (8th Cir.

2002) (quoting United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992)).  The United

States Supreme Court has explained "that coercive police activity is a necessary predicate to . . .

finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986),

and the Eighth Circuit has read that holding to mean "that police coercion is a necessary

prerequisite to a determination that a waiver was involuntary and not as bearing on the separate

question whether the waiver was knowing and intelligent."  Turner, 157 F.3d at 555 (emphasis in

original) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was voluntary, knowing, and intelligently made, a court

"looks at the totality of the circumstances and must determine whether the individual's will was

overborne."  Syslo, 303 F.3d at 866.

**b.  Discussion**

Based on the facts of the present case, the totality of the circumstances indicates that

Defendant Benais, after being advised of her Miranda rights and acknowledging that she

understood those rights, did knowingly, voluntarily, and intelligently waive those rights.

There is no evidence of any "coercive police activity" by the interviewing agents before

or during their June 13, 2013, interview with Defendant at the Red Lake Jail.  Because such

coercive activity is a prerequisite to finding that a waiver was involuntary, the Court cannot find that Defendant Benais' waiver was involuntary. Thus, the remaining question is whether Defendant's waiver was knowing and intelligent.

There is no evidence in the present record that Defendant Benais appeared intoxicated or otherwise under the influence of alcohol or drugs during the jail interview. Nor is there any other evidence in the record that would suggest that Defendant Benais' waiver executed at the outset of the Red Lake Jail interviews was not executed knowingly and intelligently. The recording of the interview demonstrates that Defendant answered the officers' questions, and gives no indication either that she did not understand her rights, or that she was not thereafter a voluntary participant in the interview. (Gov't's Ex. 3).

Consequently, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 41], be **DENIED in part** with regard to her interview with SA Ogden and Investigator Pierre on June 13, 2013, at the Red Lake Jail.

## V. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that

1. Defendant Benais' Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 40], be **DENIED**, as set forth above; and that

2. Defendant Benais' Motion to Suppress Statements, Admissions, and Answers, [Docket No. 41], be **GRANTED in part** and **DENIED in part**, as set forth above.

Dated: October 18, 2013                                   s/Leo I. Brisbois
                                                          LEO I. BRISBOIS
                                                          United States Magistrate Judge

**N O T I C E**

 Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 1, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **fourteen days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.